United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

RAHAMON WAKING SAVAGE,

          Plaintiff,

   v.

ANDREW SAUL,

          Defendant.

Case No.  18-cv-07151-RMI

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 16, 25

Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision denying his application for supplemental security income under Title XVI of the Social Security Act. On February 17, 2015, Plaintiff filed his application for benefits alleging an onset date of January 31, 2013. *See* Administrative Record ("*AR*") at 20.[1] The ALJ denied the application on November 7, 2017. *Id.* at 34. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council on September 27, 2018 (*id.* at 1-3), and thus, the ALJ's decision became the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 4, 13), both parties have moved for summary judgment (dkts. 16, 25), and Plaintiff filed a reply (dkt. 28). For the reasons stated below, the court will grant Plaintiff's motion for summary judgment, and will deny Defendant's motion for summary judgment.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be

---

[1] The *AR*, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #15. *See* (dkts. 15-1 through 15-15).

conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997).  "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## SUMMARY OF THE RELEVANT EVIDENCE

At time of his application, Plaintiff was 40 years old and had unstable housing with periods of homelessness mixed with temporary accommodations with family members. *AR* at 26, 613. He had a tumultuous childhood due to physical and emotional abuse by his father and sexual abuse by his older, female cousin. *Id.* at 593-96. Plaintiff began using substances as an adolescent and, by adulthood, he had substance-abuse issues which lead to several events of incarceration between 2011 to 2014. *Id.* at 340-441.

Plaintiff's first exposure to a mental health professional was during his 2011 incarceration for driving under the influence. *Id.* at 384. Plaintiff presented with a depressed mood and cried while providing the history of abuse and neglect he experienced growing up, like his mother leaving him on his grandmother's porch and never to return. *Id.* He reported not being able to sleep and experiencing violent nightmares. *Id.* Plaintiff explained he had experienced severe physical and emotional abuse. *Id.* Shortly before his release from jail, Plaintiff reported feelings of social isolation, hypersomnia, and weird dreams. *Id.* at 382. He reported physical abuse by his father as a child. *Id.* At the time, Plaintiff suffered from alcohol dependence and expressed that he would seek help upon release. *Id.* Plaintiff stated he planned to apply for social security benefits due to his depression, trauma from incarceration, and physical injuries related to a car accident in

United States District Court
Northern District of California

1    1999. *Id.* Upon release, Plaintiff was provided referrals to treatment programs and contact

2    information for clinics in his community. *Id.*

3        From 2011 to 2014 Plaintiff was incarcerated for several different offenses, and he

4    received mental health care during that time. *Id.* at 340-441. Several physicians and clinicians

5    diagnosed him with depression disorder, substance abuse, and assessed global assessment of

6    functioning ("GAF") scores ranging between 45 and 55 which reflected moderate to serious

7    mental health symptoms. *Id.* at 380, 376, 368. Plaintiff was prescribed Remeron for depression

8    and obtained re-fills at further evaluations. *Id.* at 376, 360-61. In 2013 and 2014, he complained of

9    hearing voices. *Id.* at 342, 368. During an evaluation in April of 2014, Plaintiff explained that

10   medication helps his mood, insomnia and auditory hallucinations, but he could not obtain

11   medication for his depression outside of jail because he could not afford to see a doctor. *Id.* at 357.

12   Without a prescription, Plaintiff self-medicated with drugs and alcohol. *Id.* During one of his final

13   mental health exams in prison, it was noted that Plaintiff's symptoms, including auditory

14   hallucinations, were controlled with medication. *Id.* 342.

15       On December 9, 2014, Plaintiff presented to Sausal Creek Outpatient Stabilization Clinic

16   for medication management. *Id.* at 454. Dr. Nicholas conducted a psychiatric assessment where

17   Plaintiff complained that he was hearing voices, seeing shadows, sleeping poorly, and suffering

18   paranoia and depression. *Id.* at 451. He stated that he first began hearing voices when he was 3 or

19   4 years old, and the voices were now instructing him to assault others. *Id.* at 452. He had been off

20   his medications since October 2014. *Id.* Plaintiff stated that he tried to commit suicide when he

21   was 12 years old by taking Benadryl. *Id.* at 452. He reported a personal history of physical and

22   sexual abuse, and he had witnessed the shooting of his best friend. *Id.* Dr. Nicholas diagnosed

23   Plaintiff with psychotic disorder NOS, mood disorder NOS, and polysubstance dependence, and

24   assessed a GAF score of 48. *Id.* Dr. Nicholas prescribed medications and referred Plaintiff to the

25   Alameda County Crisis Response Program for an evaluation. *Id.*

26       On December 17, 2014, Plaintiff was treated by Dr. Karen Yun and psychiatric nurse Eve

27   Mihata at the Alameda County Behavioral Health Care Services. *Id.* at 456-74. Plaintiff reported

28   that he was homeless and couch surfing at relatives' homes. *Id.* at 457. His chief complaint was

United States District Court
Northern District of California

hearing voices and seeing shadows, but medication alleviated those symptoms. *Id*. Plaintiff experienced insomnia and reported sleeping during the day because it was too quiet at night. *Id*. Dr. Yun found that Plaintiff's insight and judgment were impaired, and his thought content was filled with ruminations. *Id*. at 472. Plaintiff exhibited the following mental health symptoms: depressed mood; insomnia/hypersomnia; agitation; engaging in risky behavior; anxiety; hyperarousal; PTSD flashbacks; and hallucinations. *Id*. at 473. Dr. Yun diagnosed Plaintiff with mood disorder NOS, polysubstance dependence, and a GAF score of 50. *Id*. at 472-73. Plaintiff was prescribed medications and instructed to follow-up as needed. *Id*. at 473-74. Ms. Mihata attempted to call Plaintiff to schedule follow-up appointments to no avail. *Id*. at 476-77.

On April 1, 2015, psychiatric nurse Mihata completed a form about Plaintiff's work abilities due to his mental health conditions. *Id*. at 250-51. She noted that Plaintiff had moderate to marked limitations in his ability to concentrate, moderate to marked limitations with social interaction (e.g. his ability to respond appropriately to supervisors and co-workers), and marked limitations in his ability to respond appropriately to changes in a routine work setting. *Id*. Ms. Mihata wrote that Plaintiff's diagnoses of major depression, PTSD from early childhood physical and sexual abuse, auditory hallucinations, and medications were the bases for her findings. *Id*. at 251. She also noted that Plaintiff's mental health condition was persistent as evidenced by his "long history of psychiatric treatment," and would impact his ability to work for 12 months or more. *Id*.

On March 22, 2016, Plaintiff established care at the LifeLong Trust Health Center where he received care from several providers including: nurse practitioner ("NP") Kevin Lagor, licensed clinical social worker ("LCSW") Kari Petersen, LCSW Kari Jennings-Parriott, and NP Shana Green. *Id*. at 537-605; 627-36. Plaintiff's first visit was with NP Lagor, who served as Plaintiff's primary care provider. *Id*. at 558-62. Plaintiff's chief complaints were insomnia, anxiety, and paranoia. *Id*. at 558. Plaintiff reported racing thoughts and auditory hallucinations. *Id*. NP Lagor noted that Plaintiff seemed acutely aware of deaths of his relatives, and, even when teary-eyed, Plaintiff had a flat affect. *Id*. NP Lagor found Plaintiff had memory impairment, anxiety, depression, difficulty concentrating, insomnia, social anxiety, and PTSD. *Id*. at 560. NP Lagor

diagnosed Plaintiff with anxiety and unspecified psychosis and referred him to NP Shana Green for counseling and medication management. *Id*. at 561. NP Green conducted a psychiatric assessment and found Plaintiff had a constricted mood, poor eye contact, profusely tearful affect, tangential thought process, and poor insight. *Id*. at 596. Plaintiff's concentration appeared below average, and his insight into his illness and symptoms was poor. *Id*. Plaintiff again reported hearing voices and seeing shadows. *Id*. NP Green stated the most striking part of Plaintiff's presentation was his affect and mood incongruence. *Id*. She diagnosed Plaintiff with substance abuse, but she further noted that Plaintiff's history of childhood sexual and physical abuse and his behavioral history was consistent with trauma and stress related disorder, but further assessment was needed. *Id*. NP Green referred Plaintiff to LCSW Kari Petersen for therapy to assist in identifying Plaintiff's feelings and thoughts. *Id*. at 597.

On May 12, 2016, Plaintiff had his first appointment with LCSW Petersen. *Id*. at 585-86. Plaintiff explained that he was staying in the garage of his sister-in-law's section 8 housing, and he keeps a gun with him and will take it out if he feels threatened. *Id*. at 586. Plaintiff told stories about physical conflict with his girlfriend and that he had been involved in selling drugs, but LCSW Petersen noted that "it seems somehow unclear that he is able to fully organize to carry off dealing or even being engaged in a mutual relationship." *Id*. Plaintiff had a follow-up appointment with NP Green where Plaintiff reported that the medicine improved his auditory hallucinations, but he did not take his medicine nightly because it caused drowsiness and "it might cause [him] to get man boobs" and made him drowsy. *Id*. at 589-91. NP Green switched Plaintiff's medications to a drug that would make him less drowsy but still control his symptoms. *Id*. at 591. At Plaintiff's next appointment with LCSW Petersen, she diagnosed Plaintiff with unspecified personality disorder and rated a GAF score of 38. *Id*. at 582. LCSW later diagnosed Plaintiff with antisocial personality disorder. *Id*. at 572. After Plaintiff explained that he did not feel any emotions about the illegal activities he does to support himself, LCSW Petersen noted that Plaintiff was "driven and if focused in a legitimate direction, he would probably be a very successful businessman." *Id*. She instructed Plaintiff to continue therapy with LCSW Jennings-Parriott. *Id*. At his visit with Jennings-Parriott, Plaintiff was mistrustful and evasive. *Id*. at 568. Plaintiff was rambling and

tangential, and he had "inappropriate laughter through the meeting that did not fit the content." *Id*. During his last appointment in 2016, Plaintiff reported violence in his community that caused him increased anxiety and depression, as well as increased social isolation. *Id*. at 563. When he re-started treatment in 2017, LCSW Jennings-Parriott noted that Plaintiff was more anxious and depressed than he was at their last appointment. *Id*. 632. He reported being overwhelmed, isolating, and having difficulty sleeping. *Id*. At his last appointment with her, Plaintiff stated that he had attempted to interview for a job at a gym, but he became paralyzed with anxiety and could not bring himself leave his car to attend the interview. *Id*. at 630.

On March 20, 2017, LCSW Jennings-Parriott completed a mental impairment questionnaire which NP Lagor co-signed. *Id*. at 606-11. They wrote that they had treated Plaintiff bimonthly or monthly from April of 2016 to September of 2016 and reengaged with Plaintiff on February of 2017. *Id*. at 606. Plaintiff was treated for antisocial personality disorder, generalized anxiety disorder, psychosis, alcohol use disorder, marijuana use disorder, ecstasy use disorder, and PTSD. *Id*. Plaintiff was noted to have difficulty with treatment due to his inability to express his emotions, symptoms, and struggles in his daily life. *Id*. LCSW Jennings-Parriott opined that Plaintiff had extreme limitations in his ability to: interact with others; concentrate, persist or maintain pace; and adapt or manage himself. *Id*. at 608-09. She wrote that "[d]ue to [Plaintiff's] presentation and symptomology, this practitioner does not see patient having success with employment." *Id*. at 608. Although Plaintiff was abusing alcohol or drugs, LCSW Jennings-Parriott wrote that her opinion about his limitations would not materially change if he was not abusing substances. *Id*. She opined that Plaintiff would be absent from work due to his impairments and for corresponding medical treatment at least four days per month, and Plaintiff would be off task more than 30% of the time in an 8-hour workday. *Id*. She also noted that Plaintiff's symptoms and limitations caused problems with Plaintiff attending appointments, regularly taking medications, and consistently engaging with treatment. *Id*. at 610.

On August 31, 2015, Aparna Dixit, PsyD, performed a psychological evaluation of Plaintiff for disability determination. *Id*. at 499-502. Dr. Dixit performed a clinical interview, Wechsler Adult Intelligence Scale-IV ("WAIS-IV"), Wechsler Memory Scale-IV ("WMS-IV"),

6

United States District Court
Northern District of California

and Trail Making Test A and B ("TMT"). *Id.* Dr. Dixit also reviewed Plaintiff's Disability Report. *Id.* at 499. Plaintiff was 37 years old and experiencing homelessness at the time of the examination. *Id.* Plaintiff reported he had been suffering from anxiety and depression for years and had been diagnosed with PTSD. *Id.* When he was young, Plaintiff believed that inanimate objects could talk to him. *Id.* He said that smoke detectors told him to jump out of the window, and it took time for him to understand that the voices were not real. *Id.* Plaintiff experienced sexual abuse as a child. *Id.* Plaintiff also suffered the loss of several close relatives which added to his depression and feelings of helplessness. *Id.* He reported that he was not sleeping well, and he did not like being in crowded places. *Id.* He was receiving psychotherapy and counseling, and medications did not help him sleep but they helped with his mood symptoms. *Id.* at 499-500. Plaintiff explained he had a substance abuse problem, and he had abused cocaine and cannabis in the past three weeks. *Id.* at 500. He also reported struggling with drinking alcohol. *Id.* In activities of daily living, Plaintiff was able to groom himself; perform household chores; grocery shop; make simple, microwave meals; and could take public transportation. *Id.* Dr. Dixit noted that there was no evidence of psychomotor limitation or agitation, and Plaintiff's insight was fair and his judgment was intact. *Id.* During the examination, Plaintiff was cooperative and put forth adequate effort, but his attention and concentration were mildly decreased, especially on math-related tasks. *Id.* He was able to spell the word "world" forward and backward, and he could name the current president of the United States, the governor of California, and the capital of California. *Id.* Plaintiff could also do serial 3s and 7s correctly, and, throughout the exam, he worked with an even pace. *Id.*

On his diagnostic exams, Plaintiff fell within the low average range for verbal comprehension, perceptual reasoning, working memory, and processing speed. *Id.* at 501. Plaintiff's full-scale IQ was 86, within the low to average range. *Id.* at 500-01. His working memory scores fell within the average range. *Id.* On the TMT, Plaintiff's scores suggested mild impairment for sequencing, organizing, and mental flexibility. *Id.* Dr. Dixit diagnosed Plaintiff with depressive disorder NOS, rule out substance induced mood disorder, substance induced psychotic disorder, rule out psychotic disorder NOS, polysubstance abuse, and assigned a GAF

score of 65. *Id*. As far as his psychological and cognitive functioning, Plaintiff had symptoms of depression but did not display signs or symptoms of psychosis probably because of his medications. *Id*. Dr. Dixit noted that Plaintiff's drug and alcohol abuse adversely impacted his ability to achieve psychiatric stability. *Id*. In her evaluation of Plaintiff's work-related abilities, Dr. Dixit opined that Plaintiff was mildly impaired in: following or remembering complex or detailed instructions; maintaining adequate pace or persistence to perform complex tasks; maintaining adequate attention or concentration; adopting to changes in job routine; maintaining emotional stability or predictability; interacting appropriately with co-workers, supervisors, and the public on a regular basis; and performing tasks requiring mathematics skills. *Id*. at 501-02.

On November 25, 2015, Laura Jean Catlin, PsyD, conducted a psychological disability examination of Plaintiff. *Id*. at 505-15. Dr. Catlin performed the following procedures and tests: clinical interview, mental status exam, Wechsler Abbreviated Scale of Intelligence ("WASI"), Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS"), Burns PTSD Inventory, Burns Anxiety Inventory, TMT, Beck Depression Inventory ("BDI"), and review of records from Alameda County Behavioral Health Care Services. *Id*. Dr. Catlin noted that Plaintiff was cooperative and friendly and had taken the bus to the appointment, but Plaintiff had missed two prior scheduled appointments with her because he had difficulty remembering the appointments. *Id*. at 505. As for activities of daily living, Plaintiff had "severe difficulty concentrating on doing things for more than ten minutes and difficulty remembering to do things." *Id*. at 506. He reported having difficulties dealing with people he did not know and maintaining relationships because of his depressed mood and irritability. *Id*. "He no longer participate[d] in pleasurable activities and spen[t] a lot of time alone in his house because of his paranoia." *Id*. At the time, plaintiff was living with his grandmother and served as her primary caretaker. *Id*.

During the mental status exam, Plaintiff had an average response time, appeared alert and oriented, and was engaged and able to sustain concentration. *Id*. at 507. Plaintiff's mood was depressed and anxious. *Id*. at 508. Plaintiff's speech was rambling and had to be re-directed several times. *Id*. Plaintiff's eyes would tear-up during parts of the exam, but he did not indicate that he was sad. *Id*. Plaintiff had suicidal ideation but no plans or intent. *Id*. He also experienced

auditory hallucinations that told him to do physical harm to people or property. *Id*. In a portion of the mental status exam titled vegetative signs and symptoms, Plaintiff's concentration was very poor. *Id*. On the WASI test, Plaintiff had extremely low range of intellectual functioning, and he obtained an overall score in the "extremely low range" on the RBANs test which measures memory and attention. *Id*. at 509. Plaintiff scored a 40 on the BDI test which indicated severe depression. *Id*. at 511. The Burns PTSD Inventory test showed Plaintiff was experiencing many symptoms of PTSD from traumatic events in prison, including physical and sexual assaults against other inmates. *Id*. As a result of these traumatic experiences, Plaintiff felt intensely afraid, helpless, and horrified. *Id*. As for the Burns Anxiety Inventory test, Plaintiff had significant symptoms of anxiety including racing thoughts and difficulty with concentration. *Id*.

Based on the battery of tests, Dr. Catlin diagnosed Plaintiff with major depressive disorder with psychotic features, PTSD, and substance use disorder. *Id*. at 512. She opined that Plaintiff had been suffering from depression, anxiety, and PSTD for many years due to the history of physical and emotional abuse by his father (e.g. physical beating with shoes and electrical cords) and sexual molestation by his cousin. *Id*. She wrote that Plaintiff "is 'always on guard' around other people and is distrustful of everyone. He is hyper vigilant of his surroundings and has an exaggerated startle response." *Id*. Dr. Catlin opined that Plaintiff's ability to perform in the workplace would be moderately impaired and his ability to participate in activities of daily living were markedly to extremely impaired. *Id*. at 514. Specifically, Plaintiff's ability to interact appropriately with co-workers, supervisors, and the public on a regular basis was moderately to severely impaired, and Plaintiff had marked difficulties in maintaining social functioning and marked to extreme deficiencies of concentration, persistence, or pace. *Id*.

On April 12, 2017, Katherine Wiebe, Ph.D., conducted a psychological evaluation of Plaintiff which was comprised of seven procedures and tests and a review of records from Santa Rita Jail, Sausal Creek, Lifelong Trust Clinic, San Leandro Hospital, and Dr. Catlin's report. *Id*. at 612-26. She noted that Plaintiff was "socially isolated and withdrawn due to his psychiatric disorder problems." *Id*. at 614. On the functional exam, Plaintiff had problems with memory and attention. *Id*. at 617. "He [was] unable to accomplish activities of daily living due to being

9

homeless," but Plaintiff stated he could cook and clean "well enough 'to his own liking.'" *Id*. He could go shopping but had trouble remembering things and got anxious being around people at the store. *Id*. He wore sunglasses during the appointment because the glasses made him feel invisible. *Id*. He reported that he could take public transportation but that he sometimes fell asleep while in transit. *Id*. Plaintiff was noted to have fallen asleep in the waiting room, and, during the exam, Dr. Wiebe called Plaintiff's name to wake him more than 20 times. *Id*. Plaintiff attributed his difficulty staying awake to his medication. *Id*.

Dr. Wiebe found Plaintiff had severe impairment in attention and concentration because he exceeded the allotted time to complete the TMT and made ten errors. *Id*. at 618. On the Annotated Mini Mental State Exam ("AMMSE") Plaintiff was unable to subtract a string of sevens starting from 100 and was not able to spell the word "world" backwards. *Id*. Plaintiff was assessed with a severe memory impairment based on his performance on the AMMSE; he was unable to remember three words on a third trial of the test involving the same words as two prior trials. *Id*. at 619. As for sensory and motor abilities, Plaintiff "evinced psychomotor slowing, somnolence, and problems with energy and depressive fatigue." *Id*. Regarding his emotional functioning, Plaintiff's Beck Depression and Anxiety Inventory results indicated that he had severe depression and anxiety. *Id*. Plaintiff reported worrying more than he used to, isolating, being restless, having trouble sleeping, and having auditory and visual hallucinations for years. *Id*. at 621.

Dr. Wiebe concluded that Plaintiff had severe impairments with memory, attention and concentration, and he would decompensate under stress from emotional and cognitive challenges associated with a job. *Id*. at 622. She also noted that Plaintiff would "have difficulties being able to relate and communicate effectively and reliably with supervisors, co-workers, and the public in a work environment due to his psychiatric problems." *Id*. Dr. Wiebe diagnosed Plaintiff with unspecific schizophrenia, unspecified depressive disorder, generalized anxiety disorder, PTSD, unspecified neurocognitive disorder, alcohol use disorder, and cannabis use disorder. *Id*. at 623. She concluded that Plaintiff "would likely be unable to work on a full-time basis for two years even if he does not use any substances or alcohol in the future." *Id*.

//

United States District Court
Northern District of California

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show that he has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909. The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*see id*. § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ evaluated Plaintiff's application for benefits under the required five-step sequential evaluation. *AR* at 20-34. At Step One, the claimant bears the burden of showing he has not been engaged in "substantial gainful activity" since the alleged date the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. *AR* at 22.

At Step Two, the claimant bears the burden of showing that he has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff suffered from the following severe impairments: substance abuse disorder; obesity; affective mood disorder; major depressive disorder with psychotic features; generalized anxiety disorder; and post-traumatic stress disorder ("PTSD"). *AR* at 22.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing his impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four.

1   *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or

2   combination of impairments that met or medically equaled the severity of any of the listed

3   impairments. *AR* at 24-26. Next, the ALJ determined that Plaintiff retained the RFC to perform a

4   full range of work at all exertion levels but involving only simple and routine tasks, and that only

5   require him to make simple work-related decisions and to only occasionally require him to

6   appropriately interact with supervisors, coworkers, and the public. *Id*. at 26.

7       At Step Four, the ALJ determined that Plaintiff is not capable of performing any of his past

8   relevant work as a warehouse man, lightbulb assemblyman, and dining room attendant. *Id*. at 32.

9   Lastly, at Step Five, the ALJ concluded that based on the RFC, Plaintiff's age, education, and

10   work experience, and after consulting with a vocational expert, that there are jobs that exist in

11   significant numbers in which Plaintiff can still perform, such as: janitor, advertising material

12   distributor, and dishwasher. *Id*. at 33-34. Accordingly, the ALJ concluded that Plaintiff had not

13   been under a disability, as defined in the Social Security Act, from February 17, 2015, through the

14   date of the issuance of the ALJ's decision, November 7, 2017. *Id*. at 34.

15                                   **DISCUSSION**

16       Plaintiff argues that the ALJ erred in weighing the medical evidence which infected the

17   Step 3 determination of whether his impairments met or equaled an impairment listing as well as

18   the ALJ's RFC determination. *See* Pl.'s Mot. (dkt. 16) at 7-20. Plaintiff also argues that the ALJ

19   erred by discrediting his symptom testimony and by failing to properly apply Social Security

20   Ruling 85-15 at Step 5. *Id.* at 20-25. As to Plaintiff's first argument, Defendant counters that the

21   ALJ correctly weighed the medical evidence because the ALJ was only required to supply "good

22   reasons" for rejecting the medical opinion evidence, and that the ALJ was not required to give the

23   same deference to the opinions of the non-acceptable medical sources – clinical psychiatric nurse

24   Eve Mihata, LCSW Kari Jennings-Parriott, and NP Kevin Lagor – as the opinions from the

25   acceptable medical sources – Drs. Dixit, Catlin, and Wiebe. Def.'s Mot. (dkt. 25) at 3, 5-19.

26   Defendant provides little support of the ALJ's findings other than repeating the ALJ's reasoning

27   and stating those reasons were sufficient. Below is a summary of Defendant's arguments why the

28   ALJ's weighing of the medical evidence was proper.

1    Regarding Ms. Mihata's report, Defendant argues the ALJ properly assigned her opinion

2    little weight because her report was a check-the-box form, there were some normal exam findings

3    during the exam in 2014, and Plaintiff experienced some improvement with medication. *Id*. at 6-8.

4    As for assigning little weight to the opinions of NP Lagor and LCSW Jennings-Parriott, Defendant

5    claims that conjecture by Kari Petersen, LCSW, that if Plaintiff were focused, he could be a

6    successful businessman undermines their opinion. *Id*. at 9. Defendant next argues that the ALJ

7    properly assigned significant weight to consultative examiner Dr. Dixit's opinion as evidenced by

8    the fact that the ALJ assessed more restrictive limitations than Dr. Dixit opined. *Id*. at 12. As for

9    Dr. Catlin's opinion, Defendant asserts that Dr. Catlin's opinion was inconsistent with the record

10   because Plaintiff could attend to activities of daily living and tend to his grandmother. *Id*. at 14.

11   Additionally, to attack Plaintiff's argument that the ALJ's basis for rejecting Dr. Catlin's opinion

12   because she only examined Plaintiff one time applies with equal force to Dr. Dixit's opinion,

13   Defendant attempts to draw a distinction between the role of a one-time examining physician (Dr.

14   Catlin) and a consultative examiner (Dr. Dixit). *Id*. at 15. Defendant posits that the former is "by

15   nature" a one-time examiner while an examining physician has the opportunity to examine

16   Plaintiff more than once. *Id*. Defendant also argues that the ALJ properly discredited Dr. Catlin's

17   findings of marked to extreme limits in social functioning because Plaintiff made inconsistent

18   statements about his disposition toward others. *Id*. Finally, regarding Dr. Wiebe's opinion that

19   Plaintiff had marked impairments in social functioning, Defendant asserts that, "[w]hile Plaintiff

20   may have feelings of isolation and paranoia, the ALJ's limitation to occasional interaction

21   account[ed] for any such impairment in social functioning." *Id*. at 18.

22   Medical opinions are "distinguished by three types of physicians: (1) those who treat the

23   claimant (treating physicians); (2) those who examine but do not treat the claimant (examining

24   physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."

25   *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The medical opinion of a claimant's treating

26   provider is given "controlling weight" so long as it "is well-supported by medically acceptable

27   clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

28   evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); *see also Revels v. Berryhill*,

United States District Court
Northern District of California

13

874 F.3d 648, 654 (9th Cir. 2017). In cases where a treating doctor's opinion is not controlling, the opinion is weighted according to factors such as the nature and extent of the treatment relationship, as well as the consistency of the opinion with the record. 20 C.F.R. § 404.1527(c)(2)-(6); *Revels*, 874 F.3d at 654.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss*, 427 F.3d at 1216); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his [or her] interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Further, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831 (9th Cir. 1995); *see also Revels*, 874 F.3d at 654-55; *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67 n.2 (9th Cir. 2006); *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993).

For claims filed before March 27, 2017, only licensed physicians and other qualified specialists were "acceptable medical sources" under 20 C.F.R. § 404.1513(a), and mental health counselors, licensed clinical social workers, and nurse practitioners were "other sources" under 20 C.F.R. § 404.1513(d).[2] For "other sources," an ALJ may only disregard their testimony if he

---

[2] When Plaintiff filed his claim, Social Security Ruling 06-03p's definition of "other sources" included nurse practitioners, but the ruling was rescinded. Recession effective as of March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017); *see also* 20 C.F.R. § 404.1502 (2017).

United States District Court
Northern District of California

United States District Court
Northern District of California

"gives reasons germane to each witness for doing so." *Turner v. Comm'r of Soc. Sec*. 613 F.3d 1217, 1223-24 (9th Cir. 2010); *see Napier v. Saul*, 794 F. App'x 578, 580 (9th Cir. 2019) ("When reviewing claims filed prior to March 27, 2017, 'a nurse practitioner is not an acceptable medical source,' but is instead defined as an 'other source[ ]' entitled to less deference.") (quoting *Britton v. Colvin*, 787 F.3d 1011, 1013 (9th Cir. 2015)). However, "a nurse practitioner working in conjunction with a physician constitutes an acceptable medical source, while a nurse practitioner working on his or her own does not." *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996). SSR 06-03p provides: "Information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p further provides that non-acceptable medical sources should be evaluated under the same factors as all other medical opinions set forth in 20. C.F.R. § 404.1527(d). Significantly, SSR 06-03p notes that "it may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion."

In determining whether Plaintiff's impairments, or combination thereof, equaled a listing, the ALJ assigned little weight to the opinions of Drs. Catlin and Wiebe as well as the opinions of NP Lagor and LCSW Jennings-Parriott. The ALJ failed to provide the requisite justifications for rejecting their opinions. As to Drs. Catlin and Wiebe, the ALJ was required to supply specific and legitimate reasons to reject their opinions because they were contradicted by Dr. Dixit's opinion. In rejecting their opinions that Plaintiff suffered marked limitations in understanding, remembering, or applying information, the ALJ stated that their opinions were unsupported and inconsistent with the record. *Id*. at 24. The ALJ pointed to the fact that Plaintiff took public transportation to get to the hearing as contradictory evidence. However, Plaintiff was late to the hearing because he fell asleep on public transit, missed his stop, and got lost – all of which caused him anxiety. *Id*. at 62. Moreover, Dr. Catlin noted that Plaintiff had missed two prior scheduled appointments with her because Plaintiff had difficulty remembering them, and she wrote that Plaintiff had "severe difficulty concentrating on doing things for more than ten minutes and

United States District Court
Northern District of California

difficulty remembering to do things." *AR* at 506. Upon examination, Plaintiff scored in the "extremely low range" on the WASI and RBANs tests which measure memory and attention. Likewise, Dr. Wiebe's examination of Plaintiff demonstrated severe memory impairments on the AMMSE. Because taking public transportation does not contradict Drs. Catlin's and Wiebe's opinions about his ability to remember and apply information, the ALJ failed to supply adequate reasoning to reject this portion of their opinions.

As to Drs. Catlin's and Wiebe's opinions that Plaintiff had marked limitations in interacting with others, the ALJ stated that their opinions were inconsistent with their own observations of Plaintiff whom they described as pleasant and cooperative during examination. *Id.* at 24. Drs. Catlin and Wiebe based their opinions on Plaintiff's medical records and an extensive battery of diagnostic tests. Although they noted that Plaintiff was pleasant and cooperative, years of medical records and the results of their examinations revealed Plaintiff suffered severe anxiety, depression, paranoia, and PTSD which interfered with Plaintiff's activities of daily living like grocery shopping. Plaintiff found it difficult to grocery shop because the number of people around made him anxious. Dr. Catlin also noted that Plaintiff was having difficulty dealing with people he did not know and maintaining relationships because of his depressed mood and irritability; Plaintiff also avoided people due to his paranoia. *Id.* at 506. Thus, a notation that Plaintiff was cooperative during an exam is not a legitimate reason to reject Drs. Catlin's and Wiebe's opinions which were based on extensive review of medical records and diagnostic exams.

Likewise, the ALJ provided insufficient justification to reject Dr. Catlin's opinion that Plaintiff had marked to extreme limitations in concentrating, persisting, or maintaining pace. The ALJ stated that her opinion was inconsistent with her mental status exam which indicated an average response time, an alert and oriented appearance, and an engaged and sustained attention. *Id.* at 25. During the mental status exam, however, Dr. Catlin noted Plaintiff rambled on during the exam and had to be re-directed several times. *Id.* In yet another portion of the mental status exam, Plaintiff's concentration was very poor. *Id.* The Burns Anxiety Inventory test revealed that Plaintiff had significant symptoms of anxiety including racing thoughts and difficulty with concentration. *Id.* Thus, while one line of the report stated Plaintiff was engaged and alert during

16

United States District Court
Northern District of California

one portion of the exam, the remainder of the exam shows Plaintiff exhibits poor concentration, and thus, the ALJ's reason for rejecting this portion of Dr. Catlin's opinion is inadequate.

As to the opinions of NP Lagor and LCSW Jennings-Parriott, the ALJ likewise failed to provide adequate reasons for rejecting their findings in the medical source statement. In rejecting their opinion that Plaintiff had extreme limitations interacting with others, the ALJ stated it was not supported by explanation and inconsistent with their treatment records which described Plaintiff as cooperative despite maintaining poor eye contact during appointments. *See AR* at 25. Instead, the ALJ found that a moderate limitation in this area was more appropriate because Plaintiff could testify on his own behalf and adhere to proper hearing decorum. *Id*. These reasons fall short of germane reasons to reject NP Lagor and LCSW Jennings-Parriott opinions. Although not within the definition of acceptable medical source, these two clinicians (and other providers at the LifeLong Trust Health Center – LCSW Petersen and NP Green) treated Plaintiff for the longest continuous period and had bi-monthly visits with Plaintiff over that period. The ALJ was required to evaluate their opinions taking into account the nature and longevity of their doctor-patient relationship with Plaintiff. Additionally, it was noted throughout his treatment that Plaintiff had incongruent mood and affect – laughing at inappropriate times and crying without sadness – which tended to show that Plaintiff may not be able to interact appropriately with others. Additionally, LCSW Petersen noted that Plaintiff was unable to express himself which diminished the effect of treatment. Regarding Plaintiff's story about a girlfriend, LCSW Petersen made a notation that she was skeptical about the existence of such a relationship because it was unclear how plaintiff could engage in a mutual relationship. Additionally, LCSW Jennings-Parriott noted that Plaintiff was evasive and mistrustful of her during the mental status exam in September of 2016. Thus, the ALJ's reasons for rejecting the opinion of NP Lagor and LCSW Jennings-Parriott were not germane to them because they were more familiar with Plaintiff than any other medical professional, their treatment records constituted sufficient support for their findings, and their records were not inconsistent with their findings in said questionnaire.

In determining Plaintiff's RFC, the ALJ likewise failed to provide adequate justification for rejecting opinions of medical providers. First, the ALJ assigned little weight to psychiatric

United States District Court
Northern District of California

1  nurse Mihata's medical source statement from April of 2015 because it was not supported with

2  explanation, she evaluated Plaintiff one time, and she was not an acceptable medical source. While

3  Ms. Mihata may not have been an "acceptable medical source" on her own, the ALJ failed to

4  observe that she worked under Dr. Yun to evaluate Plaintiff in December of 2014, and both Dr.

5  Yun's and nurse Mihata's evaluations of Plaintiff were consistent. Thus, this reason is not

6  "germane" to Ms. Mihata. As far as her opinion not being supported by explanation, it is unclear

7  why the ALJ did not find that her and Dr. Yun's 2014 exam of Plaintiff was not an adequate basis

8  for her findings. Thus, the ALJ failed to supply germane reasons to reject Ms. Mihata's findings

9  presented in the 2015 medical source statement.

10        While assessing the RFC, the ALJ circled back to a medical source statement that LCSW

11  Jennings-Parriott completed and NP Lagor endorsed regarding his limitations, and restated that he

12  assigned it little weight because their opinion was not supported by explanation, they were not

13  acceptable medical sources, and their opinion was inconsistent with treatment records in July of

14  2017 which said Plaintiff had an appropriate mood and affect. As for the July 2017 treatment

15  record, Plaintiff presented to NP Lagor for left arm pain. As the record reflected, NP Lagor was

16  Plaintiff's primary care provider, not his psychologist or other mental health professional, that role

17  was filled by NP Green, LCSW Petersen, and LCSW Jennings-Parriott whose records consistently

18  reflected that Plaintiff had symptoms of depression, anxiety, PTSD, and personality disorder.

19  Thus, the ALJ's reasons for rejecting their opinion was not adequate.

20        As for Dr. Catlin's opinion, the ALJ advanced a new reason to assign it little weight – she

21  only treated Plaintiff one time. As Plaintiff points out, this reason misses the mark because it

22  applies with equal force to Dr. Dixit. Defendant's attempt to distinguish the role of the two

23  physicians also misses the mark. Plaintiff was referred to Dr. Catlin for a psychological disability

24  evaluation by his representative. Plaintiff did not seek treatment with Dr. Catlin. Thus, there is no

25  difference in the role that Drs. Catlin and Dixit played because they were both recruited to provide

26  opinions about Plaintiff's impairments rather than provide treatment.

27        Regarding Dr. Wiebe's opinion, the ALJ restated his earlier justifications for rejecting her

28  opinion – it was inconsistent with the overall record and her own findings – and elaborated on

them. The ALJ added that Dr. Wiebe's opinion that Plaintiff had marked limitations in interacting with the public was undermined by the fact that Plaintiff could ride public transportation. It is unclear why paying a fare, sitting on train or bus, and then disembarking at the appropriate stop means that Plaintiff was capable of having appropriate interactions with others. Many individuals take public transit without interacting with a single person; and with automated ticket stations and electronic fare cards, one does not even interact with a ticket master or driver, or other riders who are perfect strangers. The ALJ also stated that Dr. Wiebe's finding that Plaintiff had severe limitations in activities of daily living was contradicted by Plaintiff's statement that he could cook simple meals and clean well enough to his own liking. However, Dr. Wiebe also noted that Plaintiff got anxious being around other people at the grocery store and would forget the items he intended to purchase. She also noted that Plaintiff wore his sunglasses until she asked him to remove them, and Plaintiff stated he liked to wear the glasses because they made him feel invisible. Additionally, the Beck Depression and Anxiety Inventory results indicated that Plaintiff had severe depression and anxiety. Finally, the ALJ's point that Plaintiff's symptoms were controlled with medication did not constitute a legitimate reason for rejecting Dr. Wiebe's opinion because the medications caused him such drowsiness that he fell asleep on public transit, fell asleep in the waiting room before his exam, and Dr. Wiebe had to wake him 20 times during the exam.

The only opinions that the ALJ accorded significant weight were that of consultative examiner Dr. Dixit and the two non-examining state agency consultants. The ALJ assigned significant weight to Dr. Dixit's opinion because it was consistent with her own findings and she personally evaluated Plaintiff. Yet, the ALJ assessed more restrictive limitations than Dr. Dixit opined because "there is sufficient evidence over all to assign greater limitations." *Id*. at 31. It is unclear upon which record evidence the ALJ makes his findings. In fact, it seems the ALJ substituted his own opinion of Plaintiff's limitations by splitting the difference between Dr. Dixit's findings of minimal limitations and the other medical professionals' findings of more severe limitations. To the extent that the ALJ relies on the nonexamining agency consultants, as stated above, their opinions without more do not constitute substantial evidence. *Lester*, 81 F.3d at

831 (9th Cir. 1995).

Plaintiff also argues that the ALJ erred by discrediting his symptom testimony. *See* Pl.'s Mot. (dkt. 16) at 20-24. There is substantial overlap between the ALJ's reasons for rejecting the medical evidence and his reasons for rejecting Plaintiff's symptom testimony. For instance, the ALJ said the record was inconsistent with Plaintiff's alleged limitations because Plaintiff rode public transportation, cleaned to his own liking, and prepared microwave meals. *AR* at 30-31. As stated above, these activities were not representative of the whole picture of Plaintiff's limitations and abilities. The ALJ added that the fact that Plaintiff reported some traumatic events and psychiatric symptoms to certain physicians and not others, and that Plaintiff had not been hospitalized when he did not maintain his mental health treatment strongly suggested that Plaintiff exaggerated his symptoms and limitations.

The assessment of a claimant's credibility regarding the intensity of symptoms requires an ALJ to engage in a two-step analysis. *See Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). Initially, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Ghanim*, 763 F.3d at 1163 (quoting *Vasquez*, 572 F.3d at 591). If the claimant satisfies the first test, and there is no evidence of malingering, the ALJ can then reject a claimant's symptom testimony by giving specific, clear and convincing reasons for the rejection. *Id.*; *see also Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). General findings, therefore, will not suffice and an ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Ghanim*, 763 F.3d at 1163; *see also Lester*, 81 F.3d at 834.

Here, because there was no evidence of malingering, Plaintiff's testimony regarding the intensity of his symptoms could not be rejected without providing specific, clear and convincing reasons based on substantial evidence. The ALJ's explanation failed to satisfy that standard. The ALJ's point that Plaintiff's report to medical professionals was inconsistent is not all true. The ALJ notes that Plaintiff reported hallucinations to clinicians at LifeLong Trust Health Center, but

he never reported having hallucinations to the clinicians at Santa Rita jail. Plaintiff did in fact

report hallucinations to Santa Rita jail clinicians. *See id*. at 342, 368. The ALJ also finds

significance in the fact that Plaintiff failed to report witnessing traumatic events in prison to Santa

Rita jail clinicians or Dr. Dixit. However, Plaintiff disclosed these experiences to the clinicians at

LifeLong Trust Health Center who treated Plaintiff for the longest period of time and most

frequently as well as consultative examiners Drs. Catlin and Wiebe. Therefore, the ALJ's reasons

for rejecting Plaintiff's symptom testimony is not convincing.

Lastly, because the court is already remanding the case for further proceedings, the court

finds it unnecessary to address Plaintiff's remaining issue (alleged error in failing to properly

apply social security ruling 85-15 at Step 5), with the exception that the court concludes that

remand for immediate payment of benefits is not warranted. If there are no outstanding issues and

further proceedings would not be useful, courts may apply the credit as true rule and find the

relevant testimony credible as a matter of law and determine whether the record, "taken as a

whole, leaves not the slightest uncertainty as to the outcome of the proceeding." *Treichler v.

Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014). When evaluating whether the

record has been fully developed, courts "consider whether the record as a whole is free from

conflicts, ambiguities, or gaps, whether all factual issues have been resolved, and whether the

claimant's entitlements to benefits is clear under the applicable legal rules." *Id*. at 1103. "Where

there is conflicting evidence, and not all essential factual issues have been resolved, a remand for

an award of benefits is inappropriate." *Id*. at 1101. The court finds that such is the case here,

accordingly, further proceedings are necessary.

Thus, the court declines to address Plaintiff's remaining issue because his claim can be

adequately addressed on remand, and because it cannot secure for Plaintiff any relief beyond what

is already being granted. *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we

remand the case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative

ground for remand."); *see also Gutierrez v. Comm'r of Soc. Sec.*, No. 18-cv-02348-RMI, 2019

U.S. Dist. LEXIS 165711, at *30-31 (N.D. Cal. Sep. 25, 2019); *Abdul-Ali v. Berryhill*, No. 18-cv-

03615-RMI, 2019 U.S. Dist. LEXIS 138512, 2019 WL 3841995, at *7 (N.D. Cal. Aug. 15, 2019);

*Augustine ex rel. Ramirez v. Astrue*, 536 F. Supp. 2d 1147, 1153 n.7 (C.D. Cal. 2008) ("[The] Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand."). On remand, the ALJ is instructed to consider the other issues raised in Plaintiff's briefing and modify the opinion as appropriate. *See Cortes v. Colvin*, No. 2:15-cv-02277-GJS, 2016 U.S. Dist. LEXIS 40580, 2016 WL 1192638, at *4 (C.D. Cal. Mar. 28, 2016); *Cochran v. Berryhill*, No. 3:17-cv-00334-SB, 2017 U.S. Dist. LEXIS 212380, at *21 (D. Or. Dec. 28, 2017).

<b>CONCLUSION</b>

For the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 16) is **GRANTED**, and Defendant's Motion for Summary Judgment (dkt. 25) is **DENIED**. This case is **REMANDED** for further proceedings in light of the instructions provided herein.

**IT IS SO ORDERED.**

Dated: May 28, 2020

ROBERT M. ILLMAN
United States Magistrate Judge

United States District Court
Northern District of California